**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff/Respondent,

                              Criminal Case No. 06-20285
v.                                 Civil Case No. 09-14263

DOUGLAS BENIT,                HON. MARIANNE O. BATTANI

    Defendant/Petitioner.

_____/

## **OPINION AND ORDER DENYING PETITIONER'S MOTION UNDER 28 U.S.C. § 2255**

Before the Court is Petitioner Douglas Benit's Motion to Set Aside Guilty Plea and Sentence, or Alternatively, to Vacate and Correct Sentence Pursuant to U.S.S.G. § 2B1.1 and/or Restitution Order Pursuant to 28 U.S.C. § 2255 (Doc. 164). For the reasons discussed below, the Court **DENIES** the motion.

**I. BACKGROUND**

Ecorse Public Schools (EPS) employed Benit as the Assistant Superintendent. As part of his job responsibilities, he oversaw a large bond and grant-funded project to rebuild and improve school buildings and infrastructure. At the same time he was overseeing the project, Benit acted as CEO of Coral Technology, Inc. ("Coral Technology"), a company to which he directed business from EPS. Benit never disclosed his affiliation with Coral Technology to EPS.

On May 23, 2006, Benit, his wife, Coral Technology, and School Management Services, Inc., another of Benit's companies, were indicted in a nine-count indictment. The charges are as follows:

> Count 1--conspiracy to commit mail fraud, wire fraud, and federal program fraud in violation of 18 U.S.C. § 371, relating to contracts between Ecorse Public Schools and Coral Technology, Inc.;
>
> Counts 2 and 3--federal program fraud in violation of 18 U.S.C. § 666;
>
> Count 4--using the mail in a scheme to defraud the federal E-Rate program, which provides funding to schools seeking internet access in violation of 18 U.S.C. § 1341;
>
> Counts 5 and 6--using interstate wires to defraud the E-Rate program in violation of 18 U.S.C. § 1343;
>
> Count 7-- defrauding TCF Bank by submitting a false loan application in violation of 18 U.S.C. § 1344;
>
> Count 8-- using the mail to defraud First One Lending Corporation by submitting a false mortgage application in violation of 18 U.S.C. § 1341; and
>
> Count 9–conspiracy to launder money in violation of 18 U.S.C. § 1956(h).

(Doc. No. 3.)

A subsequent indictment charged Benit with using the mail to defraud Countrywide Lending by submitting a mortgage application with false income and assets in violation of 18 U.S.C. § 1341. The Court consolidated the two indictments for trial. (Doc. No. 100.)

On November 24, 2008, Benit pleaded guilty to mail fraud (Count Four) and bank fraud (Count Seven). (Doc. No. 145.) On March 26, 2009, the Court sentenced Benit to a term of imprisonment of forty-six months on each count, to be served concurrently, to be followed by a term of supervised release of thirty-six months on each count, to be

2

served concurrently. (Doc. No. 156.) In addition, the Court ordered Benit to pay restitution in the amount of $1,342,702, and a special assessment of $200. Id.

The Government dismissed the remaining counts in the first indictment as well as the second indictment. (Doc. No. 145, p. 7.) It also dismissed the indictment as to Benit's two companies, Coral Technology, Inc. and School Management Services, Inc.

At his plea and sentencing, Defendant admitted that he was the CEO of Coral Technology, Inc. at the same time he was the Assistant Superintendent at Ecorse Public Schools. During the sentencing, Benit's counsel told Benit that he was responsible for restitution amounting to the gross profits of Coral Technology. Benit asserts that this advice was "flat wrong" and that he wouldn't have pleaded guilty if he had been told otherwise. (Def.'s Motion and Brief in Support at 10.)

Defendant filed this motion under 28 U.S.C. § 2255, claiming that he was denied his Sixth Amendment right to effective assistance of counsel. According to Benit, he pleaded guilty in reliance upon the incorrect and erroneous legal advice of trial counsel. Benit identifies two areas of deficiency:

> [Trial counsel] failed to provide adequate counseling and advice as to the appropriate legal standard for determining the "amount of loss" for purposes of ascertaining the applicable offense level under the Federal Sentencing Guidelines, and in fact, provided incorrect and erroneous advice as to such legal standard; and

> [Trial counsel] failed to provide adequate counseling and advice as to the appropriate legal standard for determining the amount of actual losses sustained by each victim for purposes of determining the appropriate restitution amount, and in fact, provided incorrect and erroneous advice as to such legal standard.

(Def.'s Mot. at ¶ 9(a), (b).)

Consequently, Defendant seeks relief from his guilty plea, his sentence, and the order of restitution. Specifically, he asks the Court to set aside his guilty plea and sentence or vacate and correct his sentence to reflect the proper total offense level and correct the order of restitution to reflect the actual amount of loss sustained by each victim.

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 2255, "[a] prisoner in custody under sentence of a [federal] court. . .claiming the right to be released. . .may move the court which imposed the sentence to vacate, set aside or correct the sentence." To prevail on his § 2255 motion, the prisoner must assert as a basis for relief: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." Mallett v. United States, 334 F.3d 491, 496-97 (6th Cir. 2003) (quoting Weinberger v. United States, 268 F.3d 346, 351 (6th Cir. 2001)). When an error of constitutional magnitude is alleged to be the ineffective assistance of counsel, the defendant must satisfy the standards set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

Id. at 687.

## III. ANALYSIS

Defendant challenges the calculation of his total offense level and the calculation of restitution. According to Defendant, his attorney provided inaccurate advice about the amount of loss that is attributable to him. The Presentence Investigation Report calculated a total offense level of 23 based "upon the total amount of loss caused by [Defendant's] alleged conduct, which was incorrectly calculated in the PSR to be $2,039,900.92, and subjected [Defendant] to a term of imprisonment with a guideline range of 46 to 57 months." (Def.'s Motion at ¶ 14.) According to Benit, the amount of loss caused by his conduct is zero; therefore, the correct total offense level should have been 7. (Id. at ¶ 15.) Consequently, the correct guideline range was 0 to 6 months, not the 46 to 57 months he received. (Id. at ¶ 17.) Likewise, he asserts that the amount of restitution, $1,3422,792, was in excess of the actual losses sustained by each victim; therefore, it must be vacated and corrected. The Court discusses each argument below.

**A. Did Benit Receive Deficient Legal Advice Relative to Offense Level?**

Under the plea agreement the applicable offense level for purposes of the Federal Sentencing Guidelines was 24[1], with a guideline rage of fifty-one to sixty-three months. The level included a sixteen level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(F), because the amount of loss was determined to be more than $1,000,000. (Doc. No. 145, Plea Agreement at p. 11.) According to the Plea Agreement, both Benit and Coral Technology benefitted from Defendant's mail fraud scheme by at least $2.276 million, and Benit benefitted from his bank fraud in that he

---

[1]The Presentence Report computed Benit's total offense level to be 23.

obtained a loan from TCF National Bank because he "misrepresented and inflated his stated income and assets on the application and supporting documents in order to obtain [an equity credit lien for $200,000]." (Id. at pp. 3-4.)

Benit contends that his attorney advised him that the amounts contained in the Plea Agreement were accurate based upon the appropriate legal standard for calculating the "amount of loss" for purposes of the Federal Sentencing Guidelines. He challenges this advice based on his assertion that the amount of loss was not greater than $1,000,000. Specifically, he states that gross profit is not the measure of the amount of loss, because the amount of loss must be offset by the fair market value of all goods and services provided to EPS. U.S.S.G. § 2B1.1, n.3(E). Accordingly, Benit concludes that he did not voluntarily plead guilty because he was given bad advice about his sentencing.

The Court disagrees. Defendant's Offense Level calculation is correct; his view that there was no loss is myopic. Specifically, Benit builds his argument on his assertion that the contracts entered into with EPS were bid competitively, and that his bids were the lowest. To the contrary, Benit has not shown that his company was the low bidder in a normal bidding process or that it was positioned to or did perform any or all of its work. (PSR at ¶19-20.)

Benit compares his situation to that of the defendant in United States v. Schneider, 930 F.2d 555 (7th Cir. 1991). In Schneider, the defendants, who were low bidders on several government agency contracts, submitted false certifications and fraudulent payment and performance bonds. They were convicted of defrauding the federal agencies with which they had procured contracts. The appellate court rejected

the lower court's offense level calculation, which equated the contract prices with the amount of loss. The court of appeals noted, "The amount bid for a contract procured by fraud is not a reasonable estimate of the loss to the other party to the contract in a case such as this where the contract is terminated before that other party--the intended victim of the fraud--has paid a dime." Id. at 557. Instead, the court opined that the loss was limited to expenses incurred in terminating the contract or obtaining a substitute. Id. at 557-58.

In contrast, here the fraud was not discovered in advance of performance. Nor is this situation one in which the defendant intended to perform his contractual obligations. This case is further distinguishable from Schneider in that Benit was not an independent bidder, but an insider, who forced the low bid contractors to subcontract with his company, while keeping his identity hidden through the use of an alias.

Before addressing the particular facts underlying these distinctions, the Court observes that because Benit founded, managed, and realized the income from Coral Technology, the Court is justified in attributing the company's profits to Benit. See e.g. United States v. Goldberg, 538 F.3d 380, 390 (3d Cir. 2009) (attributing over one million dollars in gross profits from a company selling unregulated drugs to its owner under U.S.S.G. §2b1.1, Application Note 3(F)(v)). As noted by the Government, Benit funneled the contracts to Coral Technology, he caused these losses; and he is responsible for them. Accordingly, the Court directs its attention to Coral Technology.

Without question, that the bulk of Coral Technology's work and income came from EPS. Moreover, in all likelihood, had Benit's interest in Coral Technology been

7

known by Universal Service Administrative Company (USAC), which administers the E-Rate program, the E-Rate grants would not have been made. (PSR at ¶ 10.)

It is clear to this Court that the loss exceeded $1 million when considering the two E-Rate-funded contracts. Benit instructed other unwitting EPS contractors to use Coral Technology as a subcontractor. (PSR at ¶¶ 18, 19.) Specifically, USAC awarded E-Rate funding for fiber optic internal connections to General Electric Contracting (GEC) and over $4 million to NEC Business Network Solutions (NEC-BNS) for networking equipment. Benit subsequently contacted GEC and requested that it award the fiber-optic cabling subcontract to Coral Technology for $1,515,350.67 for the first year and $385,895.93 in each of the remaining four years. (PSR at ¶¶ 18-19.) As indicated in the PSR, it is doubtful that Coral Technology did any fiber optic cabling at EPS. (PSR at ¶¶ 20-23.) Another company possessed the legal permits to do the work, (PSR at ¶ 22), and the project manager on the site never heard of Coral Technology and never saw any employees of Coral Technology installing fiber optic cabling (PSR at ¶ 21.) Finally, Coral Technology paid bills for fiber optic cabling to other companies with nonbond funds. (PSR at ¶ 23.) According to the accounting records provided to the Probation Office, this one fiber optic contract resulted in a profit in excess of 86% to Coral Technology--$853,145.67. (PSR at ¶ 25.) Finally, EPS' General Funds paid matching funds in the amount of $164,600 to a fictitious joint venture, and those funds were deposited into Coral Technology's bank account. (PSR at ¶15.) Accordingly, the loss in this case includes the sum of the profit paid for work that never was performed, and the matching fund or $1,017,745.67.

8

In addition, the federal E-Rate program funded two Multicenters. Benit ordered another EPS subcontractor to use $700,000 of the E-Rate funding to buy a learning lab known as a Multicenter. (PSR at ¶ 27.) Actually two Multicenters were purchased; Defendant kept one as a sales tool. E-Rate funds may not be used for Multicenters, and USAC would not have authorized the use of funds for this purpose. (PSR at ¶ 10, ¶ 27.) Moreover, Coral Technology received a $190,000 sales commission. (PSR at ¶¶26-27.) Because EPS received a Multicenter, the minimum loss is $540,000--the cost of the one Multicenter kept by Coral Technology ($350,000) and the sales commission received by Coral Technology ($190,000).

These facts undermine any contention that the contracts resulted from a normal bidding procedure. Moreover, the Court is convinced that Coral Technology did not perform the work inasmuch as it paid only a small portion of its profits to contractors who already had done some of the work. (PSR at ¶¶ 17-24.) Finally, Coral Technology took products for its own use. (PSR at ¶ 27.) Based on the two contracts discussed above, the loss caused by Defendant's actions is no less than $1,557,745.67. This total does not even take into account the profits obtained by Coral Technology and Benit from Ecorse Public School's General Funds and Bond Funds. Defendant's conclusion that the appropriate level of loss that should be attributed to his schemes is zero is unfounded. Consequently, the Court finds that the loss set at between $1 million and $2.5 million is correct. Therefore, the 16 point addition to Defendant's sentencing guideline level, which is merely advisory, was appropriate. See U.S.S.G. § 2B1.1(b)(1). Benit cannot establish that the advice he received was deficient.

In the alternative, two additional circumstances in this case authorize the offense level used in this case. Under the guidelines, if there is a loss that cannot be determined, a court may calculate the amount of loss with reference to the amount of gain that resulted from the offense. U.S.S.G. §2B1.1, Application Note 3(B). Although the Guidelines allow for credits against a loss, for example money or property returned to victims, see U.S.S.G. §2B1.1, Application Note 3(E)(I), a defendant is not permitted to deduct business expenses from the loss figure. United States v. Byors, 586 F.3d 222, 226 (2d Cir. 2009) (under "[t]he Guidelines [ ] a loss need not be offset by any legitimate expenditures, but rather by the value that has been conferred on victims in the form of money or property returned or services rendered").

Here, a reasonable estimate of the losses caused by Benit's own actions as the Assistant Superintendent of Ecorse Public Schools in directing business to his own company does not require a deduction for business expenses. In addition, the nature of the E-Rate program allows the Court to assess the value of the entire contract as a loss. E-Rate grants constitute a "government benefit" under U.S.S.G. § 2b1.1, Application Note 3(F)(ii), which provides that "the loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be." See United States v. Maxwell, 579 F.3d 1282, 1306-07 (11th Cir. 2009) (discussing the applicability of Government Benefits provision to fraudulently diverted contracts from Miami Airport); United States v. Leahy, 464F.3d 773, 790 (7th Cir. 2006) (holding a city minority contracting program was a Government Benefits program under the guidelines); United States v. Bros. Constr. Co. of Ohio, 219 F.3d 300, 317–18 (4th Cir.) (holding the fraudulent receipt of DBE funds involved the

10

diversion of Government Benefits under the Sentencing Guidelines); United States v. Tulio, 263 Fed.Appx. 258, 263 (3d Cir. 2008) (holding Government Benefits provision of § 2B1.1 applies to DBE funded contracts). Because the E-Rate grants would never have been made had the fraud been discovered, this Court would be permitted to find Benit responsible for the full amount of the E-Rate Grants that were improperly obtained. Even if EPS did receive some benefit deducting the benefit from the amount of loss caused by Benit in calculating his Offense Level does not alter the end result.

In sum, Benit did not receive constitutionally deficient advice about the amount of loss attributable to him or the resulting guideline level.

### B. Did Benit Receive Deficient Legal Advice as to the Amount of Restitution

The Plea Agreement did not specify the amount of restitution. The PSR recommended restitution in the amount of $2,039,800.92. As the documents underlying the PSR show, and the PSR stated, Coral Technology received $1,653,982.01 of bond funding, either through direct contracts, indirect contracts, or subcontracts. (PSR at 7.) Based on the documents and anticipated testimony available to the Probation Office, the PSR initially recommended that losses subject to restitution were $446,079.75 to the Ecorse Public Schools Bond Funds, $200,575.50 to the Ecorse Public Schools General Fund, and $1,393,145.67 to the E-Rate program. (PSR at ¶ 29.) This would have resulted in restitution totaling $2,039,800.92.

Prior to Defendant's sentencing hearing, the parties met to discuss the appropriate amount of restitution. At sentencing, the parties informed the Court that they had agreed to restitution of $1,342,702, including $307,114 to the Ecorse Public

11

Schools Bond Funds, $182,588 to the Ecorse Public Schools General Fund, and $853,000 to USAC. (Doc. No. 159 at pp. 3-4.) The Court ordered restitution in the agreed upon amount, which was nearly $700,000 less than the amount recommended in the PSR.

The court is required to order. . .that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1) (restitution shall be ordered in the "full amount of each victim's losses" and "without consideration of the economic circumstances of the defendant"). 18 U.S.C. § 3664(f)(1)(A). The statute requires the government to prove the amount of each victim's loss by a preponderance of the evidence. 18 U.S.C. § 3664(e). The statute further requires the Probation Office to issue a report that includes "information sufficient for the court to exercise its discretion in fashioning a restitution order." Id. § 3664(a). This requires the Probation Office to obtain a list of the victims and the amounts subject to restitution and seek confirmation of these amounts from the identified victims. Id. § 3664(d)(1)-(2).

According to Benit, he should not be responsible for restitution based on Coral Technology's gross profits. Therefore, counsel's advise that Benit was responsible for gross profit rather than net profits to Benit himself is incorrect. Defendant suggests that it would be improper to use the full value of a contract to determine loss.

As noted above, Defendant's sentence and level of restitution were not calculated based on the full value of the contracts illegally obtained by Coral Technology. The value of goods received by EPS were deducted from the contract totals in reaching a final loss calculation. Thus, Defendant's claim that his restitution reflects the full value of Coral Technology's contract is incorrect.

12

Further, when ordering restitution in a case where the district court determines that multiple defendants have contributed to a victim's loss, "the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h). In this case, the Court, in its discretion, finds Benit responsible for the full amount of restitution.

Finally, the Court rejects Benit's argument that in the absence of any allegation in the Indictment that EPS or USAC suffered any actual losses shows that they in fact suffer no actual losses. Much of the information relative to restitution is disclosed during the preparation of the PSR.

The sentencing transcript reveals that Defendant may have believed that the restitution amount was a gross profit amount. Benit distinguished net profit to himself as less than the agreed upon restitution figure and wanted his expenses to be considered. (Sentencing Tr. at 6.) His counsel advised the Court that Benit was informed that accountability for Coral Technology fell on Benit. Although his attorney used the term gross profits, it is clear that the restitution figure of just over $1.3 million was not a reflection of Coral Technology's gross profits, which were in excess of $2 million. The Court finds that its order of restitution was reached based on proper consideration of the facts, that is the losses suffered by EPS and USAC.

## IV. CONCLUSION

For the reasons discussed, the Court **DENIES** Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence.

**IT IS SO ORDERED.**

             s/Marianne O. Battani
             MARIANNE O. BATTANI
             UNITED STATES DISTRICT JUDGE

DATED: July 27, 2010

## CERTIFICATE OF SERVICE

  Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

             s/Bernadette M. Thebolt
             Case Manager